**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and
GEICO CASUALTY CO.,

     **Jury Trial Demand**

   Plaintiffs,

  -v-

DG ESTHETIC AND THERAPY CENTER, INC,
d/b/a DG MEDICAL CENTER, DANIA LIMA,
MIAMI BLU SKY MEDICAL CENTER, INC.,
MERCEDES RAMIREZ SANCHEZ, ALEXEIS
GONZALEZ LACOSTA, OMC REHAB CENTER
LLC, OMAR CASTANEDA, PREFERRED
REHAB OF MIAMI INC., CARLOS
FERNANDEZ MESA, MAILIN RIVERO
ORTEGA, M.D., and LAUREN SCOTT
MCCARVER, M.D.,

   Defendants.

_____/

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs") hereby allege as follows:

1. This action seeks to recover more than $1,750,000.00 that the respective Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants DG Esthetic and Therapy Center, Inc, d/b/a DG Medical Center ("DG Esthetic"), Miami Blu Sky Medical Center, Inc. ("Miami Blu Sky"), OMC Rehab Center LLC ("OMC Rehab"), and Preferred

Rehab of Miami Inc. ("Preferred Rehab")(collectively, the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including patient examinations, physical therapy services, and percutaneous electrical nerve stimulation ("PENS") treatments (collectively, the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful no-fault PIP claims that the respective Defendants have submitted through the Clinic Defendants because:

(i)      at all relevant times, the Defendants operated in violation of Florida law, including Florida's Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act"), and Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute");

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received the Fraudulent Services;

(iii)    in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)     the Defendants' billing for the Fraudulent Services misrepresented the nature, extent, results, and medical necessity of the Fraudulent Services, and whether they were legitimately provided in the first place, in order to fraudulently inflate the charges submitted to GEICO;

(v)      the Defendants unlawfully billed GEICO for physical therapy services performed by massage therapists and unlicensed/unsupervised individuals; and

(vi)     the Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

2

3. The Defendants at all relevant times have known that their PIP insurance charges were fraudulent, unlawful, and ineligible for payment for the reasons set forth herein.

4. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through the Clinic Defendants to GEICO.

5. The charts attached as Exhibits "1" - "4" set forth large, representative examples of the fraudulent claims that have been identified to date that the respective Defendants have submitted through the Clinic Defendants to GEICO.

6. The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020 and have continued uninterrupted since that time. As a result of the Defendants' interrelated fraudulent and unlawful schemes, Plaintiffs have incurred damages of more than $1,750,000.00.

## I.    Plaintiffs

7. Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Bethesda, Maryland. Plaintiffs are authorized to conduct business and issue automobile insurance policies in Florida.

## II.   Defendants

8. Defendant DG Esthetic is a Florida corporation with its principal place of business in Miami, Florida. DG Esthetic was incorporated in Florida on or about August 20, 2009, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

9. At all relevant times, DG Esthetic falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact it was not operated in compliance with the Clinic Act.

10. Defendant Dania Lima ("Lima") resides in and is a citizen of Florida. Lima owned

3

and controlled DG Esthetic, and used DG Esthetic as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

11.     Defendant Miami Blu Sky is a Florida corporation with its principal place of business in Miami, Florida. Miami Blu Sky was incorporated in Florida on or about January 12, 2021, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12.     At all relevant times, Miami Blu Sky falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact it was not operated in compliance with the Clinic Act.

13.     Defendants Mercedes Ramirez Sanchez ("Sanchez") and Alexeis Gonzalez Lacosta ("Lacosta") reside in and are citizens of Florida. Sanchez owned and controlled Miami Blu Sky between January 2022 and September 2022, and Lacosta owned and controlled Miami Blu Sky between September 2022 and the present. Both Sanchez and Lacosta used Miami Blu Sky as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

14.     Defendant OMC Rehab is a Florida limited liability company with its principal place of business in Miami, Florida. OMC Rehab was organized in Florida on or about September 10, 2023, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

15.     At all relevant times, OMC Rehab falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact it was not operated in compliance with the Clinic Act.

16.     Defendant Omar Castaneda ("Castaneda") resides in and is a citizen of Florida. Castaneda owned and controlled OMC Rehab, and was its member. Castaneda used OMC Rehab as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

4

17.     Defendant Preferred Rehab is a Florida corporation with its principal place of business in Miami, Florida. Preferred Rehab was incorporated in Florida on or about October 2, 2020, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

18.     At all relevant times, Preferred Rehab falsely purported to operate a properly-licensed health care clinic in compliance with the licensing requirements set forth in the Clinic Act, but in fact it was not operated in compliance with the Clinic Act.

19.     Defendant Carlos Fernandez Mesa ("Mesa") resides in and is a citizen of Florida. Mesa owned and controlled Preferred Rehab, and used Preferred Rehab as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

20.     Defendant Mailin Rivero Ortega, M.D. ("Ortega") resides in and is a citizen of Florida. Ortega was licensed to practice medicine in Florida on or about February 22, 2021, falsely purported to serve as Miami Blu Sky's medical director from November 2021 until December 2023, and used Miami Blu Sky as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

21.     Upon information and belief based on publicly-available materials, Defendant Lauren Scott McCarver, M.D. ("McCarver") resides in and is a citizen of Arizona. McCarver was licensed to practice medicine in Florida on or about July 19, 2021, falsely purported to serve as DG Esthetic's medical director from September 2021 to the present, as Miami Blu Sky's medical director from January 2024 to the present, as OMC Rehab's medical director from May 2024 to the present, and as Preferred Rehab's medical director from August 2021 to the present, and used the Clinic Defendants as vehicles to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

**JURISDICTION AND VENUE**

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

23.     The Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

24.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS**

I.     **Overview of Pertinent Law Governing No-Fault Insurance Reimbursement**

26.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

27.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

28. In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

29. Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

30. Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

31. Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

32. Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration (the "AHCA"), and appoint a physician as medical director or clinic director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

33. Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

34. In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

35.     Moreover, a clinic medical director must "review any patient referral contracts or agreements executed by the clinic."

36.     Furthermore, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

37.     What is more, pursuant to the Clinic Act, a clinic medical director must ensure that the clinic complies with record-keeping requirements, including the obligation to maintain legible patient records.

38.     Pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

39.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

40.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

41.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith

8

effort to collect, deductibles from patients with PIP insurance.

42.     Failure to make a good-faith effort to collect PIP deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

43.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

44.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(i)     in accordance with generally accepted standards of medical practice;

(ii)    clinically appropriate in terms of type, frequency, extent, site, and duration; and

(iii)   not primarily for the convenience of the patient, physician, or other health care provider.

45.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

46.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

47.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

9

48.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

49.     Pursuant to the No-Fault Law, insurers such as GEICO also are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

50.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

51.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

52.     To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

53.     Pursuant to the No-Fault Law, insurers are not required to pay PIP Benefits to health

10

care providers that misrepresent, in their billing, the identity of the individual licensed health care practitioners who performed or directly supervised the underlying services.

## II. The Defendants' Interrelated Fraudulent and Unlawful Schemes

54. Beginning in at least 2020, and continuing through the present day, the Defendants conceived and implemented interrelated fraudulent schemes in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

### A. The Defendants' Violations of the Clinic Act

55. Because DG Esthetic, Miami Blu Sky, OMC Rehab, and Preferred Rehab were health care clinics subject to the Clinic Act: (i) Lima could not operate DG Esthetic; (ii) Sanchez and Lacosta could not operate Miami Blu Sky; (iii) Castaneda could not operate OMC Rehab; and (iv) Mesa could not operate Preferred Rehab, unless they obtained clinic licenses for their respective clinics, and unless the clinics employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

56. However, if the Clinic Defendants retained legitimate physicians to serve as their medical directors, any such physicians actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' interrelated fraudulent and unlawful schemes.

57. Accordingly:

(i) Lima retained McCarver, who was a licensed physician willing to falsely pose as the legitimate medical director at DG Esthetic, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ii) Sanchez and Lacosta retained Ortega, a licensed physician, who was willing to falsely pose as the legitimate medical director at Miami Blu Sky, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iii)   Lacosta retained McCarver, a licensed physician, who was willing to falsely pose as the legitimate medical director at Miami Blu Sky, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iv)   Castaneda retained McCarver, a licensed physician, who was willing to falsely pose as the legitimate medical director at OMC Rehab, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic; and

(v)   Mesa retained McCarver, a licensed physician, who was willing to falsely pose as the legitimate medical director at Preferred Rehab, but who – in actuality – would not fulfill the statutory requirements applicable to a clinic medical director at the clinic.

58.   McCarver was never a genuine medical director for DG Esthetic, Miami Blu Sky, OMC Rehab, and Preferred Rehab, nor, prior to McCarver, was Ortega a genuine medical director for Miami Blu Sky.

59.   Instead, throughout McCarver's association with each of the Clinic Defendants, and throughout Ortega's association with Miami Blu Sky, they ceded all day-to-day decision-making and oversight regarding health care services at the respective Clinic Defendants, and the resulting billing, to the respective Clinic Defendants' layperson owners.

60.   In keeping with the fact that McCarver was never a genuine medical director at any of the Clinic Defendants and that Ortega was never a genuine medical director at Miami Blu Sky, they never legitimately conducted systematic reviews of the clinics' billings to ensure that the billings were not fraudulent or unlawful, and instead permitted the clinics to operate in the fraudulent and unlawful manner described herein.

61.   Moreover, and as set forth herein, McCarver and Ortega never ensured that all health care practitioners at the respective Clinic Defendants had active appropriate certification or licensure for the level of care being provided, and instead permitted the respective Clinic Defendants to unlawfully bill for physical therapy services that had been performed – to the extent

12

that they were performed at all – by massage therapists and unlicensed/unsupervised individuals.

62.     Furthermore, McCarver and Ortega never legitimately served as records owners at the respective Clinic Defendants, inasmuch as they did not legitimately develop and implement policies, standards, and procedures to protect the confidentiality and security of patients' medical records at the respective Clinic Defendants, and did not legitimately train the respective Clinic Defendants' employees in such policies, standards, and procedures.

63.     What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, McCarver and Ortega never provided legitimate, day-to-day supervision at any of the Clinic Defendants, and – in fact – they only occasionally were present at the respective clinics during their purported tenures as "medical director", if at all.

64.     For instance, upon information and belief based on publicly-available information, McCarver resided primarily in Arizona during the period when she purported to serve as "medical director" at the respective Clinic Defendants.

65.     Moreover, DG Esthetic's September 2022 and March 2025 health care clinic license applications – which were submitted under penalty of perjury – represented that McCarver, DG Esthetic's purported medical director, was only present at DG Esthetic once a month.

66.     Miami Blu Sky's February 2022, November 2022, and July 2023 health care clinic license applications – which were submitted under penalty of perjury – represented that Ortega, who at the time was Miami Blu Sky's purported medical director, was only present at Miami Blu Sky once a month.

67.     Likewise, Miami Blu Sky's September 2025 health care clinic license applications – which again were submitted under penalty of perjury – represented that McCarver, who at the time was Miami Blu Sky's purported medical director, was only present at Miami Blu Sky once a month.

68. Likewise, OMC Rehab's May 2024 health care clinic license application – which also was submitted under penalty of perjury – represented that McCarver, OMC Rehab's purported medical director, was only present at OMC Rehab once a month.

69. Similarly, Preferred Rehab's January 2023 health care clinic license application – again, submitted under penalty of perjury – represented that McCarver, Preferred Rehab's purported medical director, was only present at Preferred Rehab once a month.

70. In the claims identified in Exhibits "1" - "4", the Defendants falsely represented that the respective Clinic Defendants were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

71. In fact, the Clinic Defendants were never in compliance with the Clinic Act, and thus were never eligible to receive PIP reimbursement.

**B.    The Unlawful Billing for Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals at the Clinic Defendants, and Misrepresentations Regarding the Identities of the Actual Treating Practitioners at the Clinic Defendants**

72. The Clinic Defendants billed for a limited range of health care services, specifically purported patient examinations, physical therapy services, and PENS treatments.

73. The purported physical therapy services constituted the substantial majority of the services that were billed through the respective Clinic Defendants to GEICO.

74. In the claims identified in Exhibits "1" - "4", the purported physical therapy services were unlawfully performed – to the extent they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, including Leonel C. Alonso, L.M.T. ("Alonso"), Liset Menendez Fernandez, L.M.T. ("L. Fernandez"), Ana Bertha Mejias, L.M.T. ("Mejias"), Tania Rodriguez Oti, L.M.T. ("Oti"), and Heiddy N. Pinto, L.M.T. ("Pinto").

75. L. Fernandez, Mejias, and Oti were employed by or associated with DG Esthetic,

14

and purported to perform many of the Fraudulent Services on behalf of DG Esthetic.

76.     Pinto was employed by or associated with Miami Blu Sky, and purported to perform many of the Fraudulent Services on behalf of Miami Blu Sky.

77.     Alonso was employed by or associated with Preferred Rehab, and purported to perform many of the Fraudulent Services on behalf of Preferred Rehab.

78.     The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for services performed by massage therapists or unlicensed/unsupervised individuals.

79.     As a result, and in order to conceal the fact that Alonso, L. Fernandez, Mejias, Oti, and Pinto, and other massage therapists and unlicensed/unsupervised individuals performed the purported physical therapy services that were unlawfully billed through the Clinic Defendants to GEICO, the Defendants deliberately omitted any reference to Alonso, L. Fernandez, Mejias, Oti, and Pinto and other massage therapists and unlicensed/unsupervised individuals associated with the Clinic Defendants on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

80.     Instead, in the claims for physical therapy services identified in Exhibits "1" - "4", the Defendants routinely and falsely listed physicians and advanced practice registered nurses in Box 31 of their HCFA-1500 forms as the supposed providers or direct supervisors of the underlying physical therapy services.

81.     DG Esthetic, Lima, OMC Rehab, Castaneda, and McCarver routinely falsely represented that McCarver had personally performed or directly supervised physical therapy services at DG Esthetic and OMC Rehab, respectively, despite the fact that DG Esthetic and OMC Rehab's health care clinic licensing applications – which were submitted under penalties of perjury – stated that McCarver did not provide any health care services at any of those two clinics.

82.     For example:

(i)    DG Esthetic's September 2022 and March 2025 clinic licensing applications stated that McCarver did not provide any health care services at the clinic. Even so, during the period covered by those applications, DG Esthetic, Lima, and McCarver falsely represented in the billing they submitted to GEICO that McCarver had personally performed or directly supervised dozens of physical therapy services at DG Esthetic.

(ii)    OMC Rehab's May 2024 clinic licensing application stated that McCarver did not provide any health care services at the clinic. Even so, during the period covered by that application, OMC Rehab, Castaneda, and McCarver falsely represented in the billing they submitted to GEICO that McCarver had personally performed or directly supervised more than 150 physical therapy services at OMC Rehab.

83.    Likewise, Miami Blu Sky's February 2022, November 2022, and July 2023 clinic licensing applications stated that Ortega did not provide any health care services at the clinic.

84.    Even so, during the period covered by Miami Blu Sky's February 2022, November 2022, and July 2023 clinic licensing applications, Miami Blu Sky, Sanchez, Castaneda, and Ortega falsely represented in the billing they submitted to GEICO that Ortega had personally performed or directly supervised more than 2,500 physical therapy services at Miami Blu Sky.

85.    In the claims for physical therapy services identified in Exhibits "1" - "4", the Defendants routinely falsely misrepresented that the physical therapy services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)    the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals, in contravention of Florida law;

(ii)    the Clinic Defendants could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unlicensed/unsupervised individuals, and because the clinics operated in violation of Florida law; and

(iii)    the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who personally performed or directly supervised the putative physical therapy services.

86.    In this context, McCarver, who purported to be the medical director at each of the

Clinic Defendants, and Ortega, who prior to McCarver purported to be the medical director at Miami Blu Sky, did not, and could not have, legitimately systematically reviewed the respective Clinic Defendants' billings to ensure that they were neither fraudulent nor unlawful.

87.     Had McCarver and Ortega performed their duties as medical directors at the respective Clinic Defendants, they would not have permitted the respective Clinic Defendants to unlawfully bill for physical therapy services that had been performed by massage therapists and unlicensed/unsupervised individuals, and would not have permitted the Clinic Defendants' billings to misrepresent the identities of the actual treating practitioners.

**C.     The Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

88.     The Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the Clinic Defendants for medically unnecessary treatment.

89.     Accordingly, as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

90.     In keeping with this fact, in almost all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through the Clinic Defendants to GEICO for the Defendants' Fraudulent Services, the respective Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patients.

91.     In the claims identified in Exhibits "1" - "4", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable,

17

when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, PIP insurance deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

92. In this context, McCarver, who purported to be the medical director at each of the Clinic Defendants, and Ortega, who prior to McCarver purported to be the medical director at Miami Blu Sky, did not, and could not have, legitimately systematically reviewed the respective Clinic Defendants' billings to ensure that they were neither fraudulent nor unlawful.

93. Had McCarver legitimately systematically reviewed the Clinic Defendants' billings to ensure that they were neither fraudulent nor unlawful, and had Ortega legitimately systematically reviewed Miami Blu Sky's billings to ensure that they were neither fraudulent nor unlawful, they would have noted – among other things – that each of the Clinic Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute, and they would have taken immediate corrective action.

**D.      The Defendants' Fraudulent Treatment and Billing Protocols**

94. In the claims identified in Exhibits "1" - "4", almost none of the Insureds whom the respective Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor accidents they experienced.

95. Even so, in the claims identified in Exhibits "1" - "4", the Defendants purported to subject the Insureds to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to the "treatment".

96. The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "4" without regard for the Insureds' individual symptoms or presentation, or – in almost every case – the absence of any significant continuing medical problems arising from any automobile accidents.

97. Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

98. No legitimate physician, health care practitioner, or clinic would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

99. The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1. The Fraudulent Charges for Initial Examinations at DG Esthetic, Miami Blu Sky, and OMC Rehab**

100. Many of the Insureds in the claims identified in Exhibits "1" - "3" purportedly received an initial examination at DG Esthetic, Miami Blu Sky, and OMC Rehab.

101. In the claims identified in Exhibit "1", DG Esthetic, Lima, and McCarver then billed the purported initial examinations through DG Esthetic to GEICO under CPT codes 99203 and 99205, resulting in charges of $260.00 and $400.00, respectively, for each purported examination.

102. In the claims identified in Exhibit "2", Miami Blu Sky, Lacosta, Ortega, and McCarver then billed the purported initial examinations through Miami Bly Sky to GEICO under CPT code 99203, resulting in a charge of $300.00 or $350.00 for each purported examination.

19

103.   In the claims identified in Exhibit "3", OMC Rehab, Castaneda, and McCarver then billed the purported initial examinations through OMC Rehab to GEICO under CPT code 99204, resulting in a charge of $285.00 for each purported examination.

104.   In the claims for initial examinations identified in Exhibits "1" - "3", the charges for the initial examinations were fraudulent in that they misrepresented DG Esthetic, Miami Blu Sky, and OMC Rehab's eligibility to collect PIP Benefits in the first instance.

105.   In fact, DG Esthetic, Miami Blu Sky, and OMC Rehab were not eligible to collect PIP Benefits, inasmuch as the clinics were operated in violation of Florida law.

106.   The charges for the initial examinations identified in Exhibits "1" - "3" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations, and whether they were legitimately performed in the first place.

**(i)    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

107.   As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

108.   The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

109.   Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the patient presented with problems of moderate severity.

110.   The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination, including:

   (i)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

      (ii)      Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

      (iii)     Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

      (iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

      (v)      Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

111.    Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

112.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the patient presented with problems of moderate to high severity.

113.    The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination, including:

      (i)       Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

      (ii)      Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

      (iii)     Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

      (iv)     Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

      (v)      Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)   Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

114.   Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

115.   Furthermore, pursuant to the CPT Assistant, the use of CPT code 99205 to bill for an initial patient examination represents that the patient presented with problems of high severity.

116.   The CPT Assistant provides the following clinical examples of high severity presenting problems that would support the use of CPT code 99205 to bill for an initial patient examination:

(i)   Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis. (Cardiology)

(ii)   Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension. (Family Medicine)

(iii)   Initial office visit for a 73-year-old male with an unexplained 20-pound weight loss. (Hematology/Oncology)

(iv)   Initial office visit for a 24-year-old homosexual male who has a fever, a cough, and shortness of breath. (Infectious Disease)

(v)   Initial office evaluation, patient with systemic lupus erythematosus, fever, seizures and profound thrombocytopenia. (Rheumatology)

(vi)   Initial office evaluation and management of patient with systemic vasculitis and compromised circulation to the limbs. (Rheumatology)

117.   Accordingly, pursuant to the CPT Assistant, the high severity presenting problems that could support the use of CPT code 99205 to bill for an initial patient examination typically

22

are problems that pose a critical threat to the patient's health, or even the patient's life.

118.    However, to the extent that the Insureds in the claims identified in Exhibits "1" - "3" had any presenting problems at all as the result of their typically minor automobile accidents, problems almost always were minimal severity soft tissue injuries such as sprains and strains.

119.    For instance, in most of the claims identified in Exhibits "1" - "3", the Insureds did not seek treatment at any hospital as the result of their accidents, and to the limited extent that the Insureds in the claims identified in Exhibits "1" - "3" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

120.    Furthermore, in most of the claims identified in Exhibits "1" - "3", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

121.    Even so, in the claims for initial examinations identified in Exhibits "1" - "3", the respective Defendants billed for the examinations using CPT codes 99203, 99204, and 99025, and thereby falsely represented that the Insureds presented with problems of moderate severity, moderate to high severity, and high severity.

122.    For example:

(i)    On November 9, 2022, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that LA was not injured. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of LA on November 15, 2022, DG Esthetic, Lima, and McCarver billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(ii)     On August 3, 2023, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that MP was not injured. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MP on August 8, 2023, DG Esthetic, Lima, and McCarver billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the examination involved presenting problems of high severity.

(iii)    On August 20, 2023, an Insured named HD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that HD was not injured. In keeping with the fact that HD was not seriously injured, HD did not visit any hospital emergency room following the accident. To the extent that HD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of HD on August 28, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(iv)     On November 13, 2023, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that DS was not injured. In keeping with the fact that DS was not seriously injured, DS did not visit any hospital emergency room following the accident. To the extent that DS experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of DS on November 14, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(v)      On December 23, 2023, an Insured named VD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that VD was not injured. In keeping with the fact that VD was not seriously injured, VD did not visit any hospital emergency room following the accident. To the extent that VD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of VD on December 29, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

24

(vi)  On January 2, 2024, an Insured named PG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that PG was not injured. In keeping with the fact that PG was not seriously injured, PG did not visit any hospital emergency room following the accident. To the extent that PG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of PG on January 2, 2024, Miami Blu Sky, Lacosta, and McCarver billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved presenting problems of moderate severity.

(vii)  On March 4, 2024, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that JA was not injured. In keeping with the fact that JA was not seriously injured, JA did not visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JA on March 5, 2024, DG Esthetic, Lima, and McCarver billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the examination involved presenting problems of high severity.

(viii)  On July 2, 2024, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that MS was not injured. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MS on July 5, 2024, OMC Rehab, Castaneda, and McCarver billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(ix)  On July 2, 2024, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that MD was not injured. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MD on July 8, 2024, DG Esthetic, Lima, and McCarver billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that the examination involved presenting problems of high severity.

(x)     On November 12, 2024, an Insured named JT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that the vehicle was drivable following the accident. The police report further indicated that JT was not injured. In keeping with the fact that JT was not seriously injured, JT did not visit any hospital emergency room following the accident. To the extent that JT experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JT on November 14, 2024, OMC Rehab, Castaneda, and McCarver billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

123.     In the claims identified in Exhibits "1" - "3", the respective Defendants routinely falsely represented that the Insureds presented with problems of moderate severity, moderate to high severity, or high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203, 99204, and 99205, because examinations billable under CPT codes 99203, 99204, and 99205 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that DG Esthetic, Miami Blu Sky, and OMC Rehab purported to provide to the Insureds.

**(ii)     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

124.     What is more, in the claims identified in Exhibits "1" - "3", the charges for the initial examinations under CPT codes 99203, 99204, and 99205 misrepresented and exaggerated the amount of time that the examining health care practitioners spent performing the examinations.

125.     Pursuant to the CPT Assistant, the use of CPT codes 99203, 99204, and 99205 to bill for an initial examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 30 minutes, 45, minutes, or 60 minutes, respectively, performing the examination.

126.     When the respective Defendants billed for the initial examinations in the claims identified in Exhibits "1" - "3", they represented that the examining practitioners spent at least 30

minutes (when billed under CPT code 99203), 45 minutes (when billed under CPT code 99204), or 60 minutes (when billed under CPT code 99205) of time performing the examinations.

127.    However, in the initial examinations identified in Exhibits "1" - "3", the practitioners who purported to perform the initial examinations on behalf of DG Esthetic, Miami Blu Sky, and OMC Rehab did not spend more than 15 minutes when performing the examinations, much less 30 minutes, 45, minutes, or 60 minutes.

128.    In keeping with the fact that the initial examinations in the claims identified in Exhibits "1" - "3" did not take more than 15 minutes of time to perform, the examining practitioners used template forms in purporting to conduct the examinations.

129.    All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

130.    These interviews and limited examinations did not require the examining health care practitioners associated with DG Esthetic, Miami Blu Sky, and OMC Rehab to spend more than 15 minutes performing the putative initial examinations.

131.    In the claims for initial examinations that are identified in Exhibits "1" - "3", the respective Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203, 99204, and 99205 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)    Misrepresentations Regarding the Extent of the Medical Decision-Making**

132.    Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical

27

decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

133.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

134.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

135.    For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things: (i) involve review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) there typically must be at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

136.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

137.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i)

chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

138.    Furthermore, pursuant to the CPT Assistant, the use of CPT code 99205 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "high complexity" medical decision-making in connection with the examination.

139.    For an initial patient examination to legitimately entail "high complexity" medical decision-making, the examination typically must – among other things – involve: (i) chronic illness with severe exacerbation, progression, or side effects from treatment, or else acute or chronic illness or injury that poses a legitimate threat to life or bodily function; (ii) review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "moderate complexity" medical decision-making; and (iii) at least a high risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

140.    When the respective Defendants billed for the initial examinations in the claims identified in Exhibits "1" - "3", they represented that the examining practitioners engaged in legitimate low complexity medical decision-making (when billed under CPT code 99203), moderate complexity medical decision-making (when billed under CPT code 99204), or high complexity medical decision-making (when billed under CPT code 99205).

141.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

29

142. First, in the claims for initial examinations identified in Exhibits "1" - "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

143. When the Insureds in the claims identified in Exhibits "1" - "3" presented to DG Esthetic, Miami Blu Sky, and OMC Rehab for "treatment", they did not arrive with any significant medical records.

144. Furthermore, prior to the initial examinations, DG Esthetic, Miami Blu Sky, OMC Rehab, and their associates did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

145. Second, in the claims for initial examinations identified in Exhibits "1" - "3", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints, to the extent that the Insureds had any continuing complaints arising from their minor automobile accidents at all at the time of the purported examinations.

146. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by DG Esthetic, Miami Blu Sky, OMC Rehab, and their associates during the initial examinations.

147. In the claims identified in Exhibits "1" - "3", any diagnostic procedures and treatment options that DG Esthetic, Miami Blu Sky, OMC Rehab, and their associates recommended or provided during the initial examinations were limited to a series of medically unnecessary physical therapy and related services and goods – none of which was health- or life-threatening if properly administered.

148.    Third, in the claims for initial examinations identified in Exhibits "1" - "3", the examining practitioners did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

149.    Rather, to the extent that the initial examinations were conducted in the first instance, the examining practitioners provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each Insured, and prescribed a substantially similar course of medically unnecessary treatment for each Insured.

150.    Specifically, in the claims identified in Exhibits "1" - "3", during the initial examinations, the Insureds almost never reported any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

151.    Even so, the examining practitioners – at the direction of DG Esthetic, Lima, and McCarver in the claims identified in Exhibit "1", Miami Blu Sky, Lacosta, Ortega, and McCarver in the claims identified in Exhibit "2", and OMC Rehab, Castaneda, and McCarver in the claims identified in Exhibit "3" – prepared initial examination reports in which they provided false, boilerplate soft tissue injury diagnoses to the Insureds, and then directed the Insureds to receive a series of medically unnecessary physical therapy and related services and goods.

152.    Contrary to these false diagnoses, almost none of the Insureds in the claims identified in Exhibits "1" - "3" legitimately suffered from any significant health care problems at all as the result of their typically minor automobile accidents.

153.    For example:

(i)     On December 12, 2022, an Insured named IC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IC's vehicle did not deploy and that IC's vehicle was drivable following the accident. The police report further indicated that IC was not injured. In keeping with the fact that IC was not seriously injured in the accident, IC did not visit any hospital emergency room following the accident. To the extent that IC experienced any health problems at all as a result of the accident, they were of minimal severity. On

31

December 28, 2022, Stephanie Ferrer, A.P.R.N. ("Ferrer") purported to conduct an initial examination of IC at DG Esthetic. Ferrer did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Ferrer – at the direction of DG Esthetic, Lima, and McCarver – provided IC with a list of false soft tissue injury "diagnoses". Furthermore, neither IC's presenting problems, nor the treatment plan provided to IC by DG Esthetic, presented any risk of significant complications, morbidity, or mortality. To the contrary, IC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by DG Esthetic consisted of medically unnecessary physical therapy treatment, which did not pose any risk to IC if properly administered. Even so, DG Esthetic, Lima, and McCarver billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ferrer engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)   On November 13, 2023, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DS's vehicle did not deploy and that DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured. In keeping with the fact that DS was not seriously injured in the accident, DS did not visit any hospital emergency room following the accident. To the extent that DS experienced any health problems at all as a result of the accident, they were of minimal severity. On November 14, 2023, Sandra Rua, A.P.R.N. ("Rua") purported to conduct an initial examination of DS at Miami Blu Sky. Rua did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Rua – at the direction of Miami Blu Sky, Lacosta, and Ortega – provided DS with a list of false soft tissue injury "diagnoses". Furthermore, neither DS's presenting problems, nor the treatment plan provided to DS by Miami Blu Sky, presented any risk of significant complications, morbidity, or mortality. To the contrary, DS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Miami Blu Sky consisted of medically unnecessary physical therapy treatment, which did not pose any risk to DS if properly administered. Even so, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rua engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)   On November 23, 2023, an Insured named OE was involved in an automobile accident. The contemporaneous police report indicated that the airbags in OE's vehicle did not deploy and that OE's vehicle was drivable following the accident. The police report further indicated that OE was not injured. In keeping with the fact that OE was not seriously injured in the accident, OE did not visit any hospital emergency room following the accident. To the extent that OE experienced any health problems at all as a result of the accident, they were of minimal severity. On November 28, 2023, Ferrer purported to conduct an initial examination of OE at DG Esthetic. Ferrer did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the

examination. Instead, Ferrer – at the direction of DG Esthetic, Lima, and McCarver – provided OE with a list of false soft tissue injury "diagnoses". Furthermore, neither OE's presenting problems, nor the treatment plan provided to OE by DG Esthetic, presented any risk of significant complications, morbidity, or mortality. To the contrary, OE did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by DG Esthetic consisted of medically unnecessary physical therapy treatment, which did not pose any risk to OE if properly administered. Even so, DG Esthetic, Lima, and McCarver billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Ferrer engaged in some legitimate, high complexity medical decision-making during the purported examination.

(iv)   On December 23, 2023, an Insured named VD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in VD's vehicle did not deploy and that VD's vehicle was drivable following the accident. The police report further indicated that VD was not injured. In keeping with the fact that VD was not seriously injured in the accident, VD did not visit any hospital emergency room following the accident. To the extent that VD experienced any health problems at all as a result of the accident, they were of minimal severity. On December 29, 2023, Rua purported to conduct an initial examination of VD at Miami Blu Sky. Rua did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Rua – at the direction of Miami Blu Sky, Lacosta, and Ortega – provided VD with a list of false soft tissue injury "diagnoses". Furthermore, neither VD's presenting problems, nor the treatment plan provided to VD by Miami Blu Sky, presented any risk of significant complications, morbidity, or mortality. To the contrary, VD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Miami Blu Sky consisted of medically unnecessary physical therapy treatment, which did not pose any risk to VD if properly administered. Even so, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rua engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)   On January 2, 2024, an Insured named PG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in PG's vehicle did not deploy and that PG's vehicle was drivable following the accident. The police report further indicated that PG was not injured. In keeping with the fact that PG was not seriously injured in the accident, PG did not visit any hospital emergency room following the accident. To the extent that PG experienced any health problems at all as a result of the accident, they were of minimal severity. On January 2, 2024, Orlando Javier Suarez, A.P.R.N. ("Suarez") purported to conduct an initial examination of PG at Miami Blu Sky. Suarez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Suarez – at the direction of Miami Blu Sky, Lacosta, and McCarver – provided PG with a list of false soft tissue injury "diagnoses". Furthermore, neither PG's presenting problems, nor the treatment plan

provided to PG by Miami Blu Sky, presented any risk of significant complications, morbidity, or mortality. To the contrary, PG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Miami Blu Sky consisted of medically unnecessary physical therapy treatment, which did not pose any risk to PG if properly administered. Even so, Miami Blu Sky, Lacosta, and McCarver billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Suarez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)     On July 2, 2024, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MD's vehicle did not deploy and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured. In keeping with the fact that MD was not seriously injured in the accident, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of minimal severity. On July 8, 2024, Evelin Gonzalez Fernandez, A.P.R.N. ("E. Fernandez") purported to conduct an initial examination of MD at DG Esthetic. E. Fernandez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, E. Fernandez – at the direction of DG Esthetic, Lima, and McCarver – provided MD with a list of false soft tissue injury "diagnoses". Furthermore, neither MD's presenting problems, nor the treatment plan provided to MD by DG Esthetic, presented any risk of significant complications, morbidity, or mortality. To the contrary, MD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by DG Esthetic consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MD if properly administered. Even so, DG Esthetic, Lima, and McCarver billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that E. Fernandez engaged in some legitimate, high complexity medical decision-making during the purported examination.

(vii)    On August 27, 2024, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RG's vehicle did not deploy and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured. In keeping with the fact that RG was not seriously injured in the accident, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as a result of the accident, they were of minimal severity. On September 10, 2024, Alida Lopez, A.P.R.N. ("Lopez") purported to conduct an initial examination of RG at OMC Rehab. Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Lopez – at the direction of OMC Rehab, Castaneda, and McCarver – provided RG with a list of false soft tissue injury "diagnoses". Furthermore, neither RG's presenting problems, nor the treatment plan provided to RG by OMC Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, RG did not need any

34

extensive treatment at all as a result of the accident, and the treatment plan provided by OMC Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to RG if properly administered. Even so, OMC Rehab, Castaneda, and McCarver billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Lopez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)     On November 25, 2024, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MP's vehicle did not deploy and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured. In keeping with the fact that MP was not seriously injured in the accident, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of minimal severity. On November 26, 2024, Lopez purported to conduct an initial examination of MP at OMC Rehab. Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Lopez – at the direction of OMC Rehab, Castaneda, and McCarver – provided MP with a list of false soft tissue injury "diagnoses". Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by OMC Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by OMC Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MP if properly administered. Even so, OMC Rehab, Castaneda, and McCarver billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Lopez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)     On January 10, 2025, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SM's vehicle did not deploy and that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured. In keeping with the fact that SM was not seriously injured in the accident, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as a result of the accident, they were of minimal severity. On January 13, 2025, E. Fernandez purported to conduct an initial examination of SM at DG Esthetic. E. Fernandez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, E. Fernandez – at the direction of DG Esthetic, Lima, and McCarver – provided SM with a list of false soft tissue injury "diagnoses". Furthermore, neither SM's presenting problems, nor the treatment plan provided to SM by DG Esthetic, presented any risk of significant complications, morbidity, or mortality. To the contrary, SM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by DG Esthetic consisted of medically unnecessary physical therapy treatment, which did not pose any risk to SM if properly administered. Even so, DG Esthetic, Lima, and McCarver billed

35

GEICO for the initial examination using CPT code 99205, and thereby falsely represented that E. Fernandez engaged in some legitimate, high complexity medical decision-making during the purported examination.

(x) On February 24, 2025, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HA's vehicle did not deploy and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured. In keeping with the fact that HA was not seriously injured in the accident, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as a result of the accident, they were of minimal severity. On February 28, 2025, Lopez purported to conduct an initial examination of HA at OMC Rehab. Lopez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Instead, Lopez – at the direction of OMC Rehab, Castaneda, and McCarver – provided HA with a list of false soft tissue injury "diagnoses". Furthermore, neither HA's presenting problems, nor the treatment plan provided to HA by OMC Rehab, presented any risk of significant complications, morbidity, or mortality. To the contrary, HA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by OMC Rehab consisted of medically unnecessary physical therapy treatment, which did not pose any risk to HA if properly administered. Even so, OMC Rehab, Castaneda, and McCarver billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Lopez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

154. In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

155. It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

156. Even so, in the claims identified in Exhibits "1" - "3", the respective Defendants routinely caused Insureds to immediately begin a course of physical therapy, often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

36

157. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

158. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

159. As set forth herein, in the claims identified in Exhibits "1" - "3", a substantial number of the Insureds whom DG Esthetic, Miami Blu Sky, and OMC Rehab purported to treat were involved in relatively minor accidents.

160. It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "3" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

161. It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients being treated at DG Esthetic, Miami Blu Sky, and OMC Rehab, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

162. Even so, in keeping with the fact that the putative "diagnoses" by DG Esthetic, Miami Blu Sky, and OMC Rehab were pre-determined and false, DG Esthetic, Miami Blu Sky, and OMC Rehab repeatedly purported to provide examinations – on or about the same date – to more than one Insured involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially similar, false "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

163. For example:

37

(i)     On August 4, 2022, two Insureds – EH and DQ – were involved in the same automobile accident. Thereafter, both Insureds presented at DG Esthetic on August 5, 2022 for initial examinations. At the conclusion of the purported initial examinations by Ferrer, DG Esthetic, Lima, and McCarver caused EH and DQ to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii)    On March 28, 2023, two Insureds – MC and RG – were involved in the same automobile accident. Thereafter, both Insureds presented at DG Esthetic on March 29, 2023 for initial examinations. At the conclusion of the purported initial examinations by Ferrer, DG Esthetic, Lima, and McCarver caused MC and RG to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii)   On June 27, 2023, two Insureds – JC and RC – were involved in the same automobile accident. Thereafter, both Insureds presented at Miami Blu Sky on June 28, 2023 for initial examinations. At the conclusion of the purported initial examinations by Suarez, Miami Blu Sky, Lacosta, and Ortega caused JC and RC to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv)    On October 28, 2023, two Insureds – JG and DM – were involved in the same automobile accident. Thereafter, both Insureds presented at Miami Blu Sky on October 30, 2023 for initial examinations. At the conclusion of the purported initial examinations by Rua, Miami Blu Sky, Lacosta, and Ortega caused JG and DM to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)     On November 29, 2023, three Insureds – JC, JH, and SH – were involved in the same automobile accident. Thereafter, all three Insureds presented at Miami Blu Sky on November 30, 2023 for initial examinations. At the conclusion the purported initial examinations by Suarez and Rua, Miami Blu Sky, Lacosta, and Ortega caused JC, JH, and SH to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vi)    On January 2, 2024, three Insureds – CG, PG, and SP – were involved in the same automobile accident. Thereafter, PG presented at Miami Blu Sky on January 2, 2024 for an initial examination, and CG and SP presented at Miami Blu Sky on January 3, 2024 for initial examinations. At the conclusion the purported initial examinations by Suarez and McCarver, Miami Blu Sky, Lacosta, and McCarver caused CG, PG, and SP to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically

38

unnecessary treatment to all three of them.

(vii)  On February 18, 2024, two Insureds – AM and LR – were involved in the same automobile accident. Thereafter, both Insureds presented at DG Esthetic on February 20, 2024 for initial examinations. At the conclusion of the purported initial examinations by McCarver, DG Esthetic, Lima, and McCarver caused AM and LR to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)  On March 4, 2024, three Insureds – JA, GP, and MS – were involved in the same automobile accident. Thereafter, JA and GP presented at DG Esthetic on March 5, 2024 for initial examinations, and MS presented at DG Esthetic on March 11, 2024 for an initial examination. At the conclusion of the purported initial examinations by Ferrer, DG Esthetic, Lima, and McCarver caused JA, GP, and MS to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(ix)  On September 11, 2024, two Insureds – EK and CV – were involved in the same automobile accident. Thereafter, both Insureds presented at OMC Rehab on September 12, 2024 for initial examinations. At the conclusion of the purported initial examinations by Lopez, OMC Rehab, Castaneda, and McCarver caused EK and CV to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(x)  On September 23, 2024, two Insureds – MM and MP – were involved in the same automobile accident. Thereafter, both Insureds presented at OMC Rehab on November 16, 2024 for initial examinations. At the conclusion of the purported initial examinations by Lopez, OMC Rehab, Castaneda, and McCarver caused MM and MP to be provided with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

164.  In the claims for initial examinations identified in Exhibits "1" - "3", the respective Defendants routinely falsely represented that the initial examinations involved medical decision-making of low, moderate, and high complexity in order to create a false basis to bill for the initial examinations under CPT codes 99203, 99204, and 99205, because CPT codes 99203, 99204, and 99205 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

165.     In the claims for initial examinations that are identified in Exhibits "1" - "3", DG Esthetic, Miami Blu Sky, and OMC Rehab, on multiple occasions, caused the issuance of substantially similar "diagnoses" to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

166.     In the claims for initial examinations identified in Exhibits "1" - "3", the respective Defendants routinely falsely represented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)     DG Esthetic, Miami Blu Sky, and OMC Rehab were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were unlawfully operated in violation of Florida Law.

**2.     The Fraudulent Charges for Follow-Up Examinations at DG Esthetic**

167.     As set forth herein, in the claims identified in Exhibit "1", DG Esthetic, Lima, and McCarver purported to provide most Insureds with a supposed course of physical therapy treatment.

168.     DG Esthetic, Lima, and McCarver then billed the physical therapy services to GEICO using a variety of CPT codes.

169.     At the same time, DG Esthetic, Lima, and McCarver routinely billed GEICO under CPT code 99211 for multiple putative follow-up examinations that they supposedly provided to

40

the Insureds at the same time as the physical therapy treatment, seeking $46.50 or $50.00 for each such putative follow-up examination.

170.     However, these supposed "examinations" were never truly separate services from the putative physical therapy services.

171.     Instead, DG Esthetic, Lima, and McCarver billed GEICO for illusory follow-up examinations under CPT code 99211 in order to maximize the fraudulent billing they submitted to GEICO.

172.     In keeping with the fact that the follow-up examinations that they billed under CPT code 99211 were illusory, DG Esthetic, Lima, and McCarver did not submit any reports, notes, or any substantiating documentation in connection with the purported follow-up examinations billed under CPT code 99211.

173.     Even so, to maximize the amount of fraudulent and unlawful PIP billing they could submit to GEICO, DG Esthetic, Lima, and McCarver routinely submitted charges under CPT code 99211 for illusory follow-up examinations contemporaneous with charges for putative physical therapy services.

174.     In the claims for follow-up examinations identified in Exhibit "1", DG Esthetic, Lima, and McCarver routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    DG Esthetic was never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of Florida law.

41

**3.      The Fraudulent Charges for Follow-Up Examinations at Miami Blu Sky**

175.    In addition to their fraudulent initial examinations, Miami Blu Sky, Lacosta, Ortega, and McCarver often purported to subject each of the Insureds in the claims identified in Exhibit "2" to multiple fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocol.

176.    As set forth in Exhibit "2", Miami Blu Sky, Lacosta, Ortega, and McCarver billed the purported follow-up examinations through Miami Blu Sky to GEICO under: (i) CPT code 99213, resulting in a charge of $180.00 or $200.00; and (ii) CPT code 99214, resulting in a charge of $290.00 for each putative follow-up examination.

177.    In the claims for follow-up examinations identified in Exhibit "2", the charges for the follow-up examinations were fraudulent in that they misrepresented Miami Blu Sky's eligibility to collect PIP Benefits in the first instance.

178.    In fact, and as set forth herein, Miami Blu Sky was never eligible to collect PIP Benefits, inasmuch as Miami Blu Sky operated in violation of Florida law.

179.    The charges by Miami Blu Sky, Lacosta, Ortega, and McCarver for the follow-up examinations identified in Exhibit "2" were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations, and whether they legitimately were provided in the first place.

180.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up patient examination represents that the patient presented with problems of low to moderate severity.

181.    The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, including:

42

(i)     Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

182.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

183.    Similarly, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination represents that the insured presented with problems of moderate to high severity.

184.    The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination, including:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with

metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv) Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v) Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi) Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii) Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii) Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

185. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

186. However, to the extent that the Insureds in the claims identified in Exhibit "2" suffered any injuries at all in their automobile accidents, the injuries were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

187. Minor soft tissue injuries such as strains and sprains almost always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "2" presented for their putative follow-up examinations – typically weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

188. Even so, in the claims for the follow-up examinations under CPT code 99213 and

44

99214 identified in Exhibit "2", Miami Blu Sky, Lacosta, Ortega, and McCarver represented that

the Insureds presented with problems of low to moderate severity or moderate to high severity,

respectively.

189.    For example:

(i)     On June 27, 2023, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JC's vehicle did not deploy and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured. In keeping with the fact that JC was not seriously injured in the accident, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of JC by Ortega on July 26, 2023 and August 23, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that JC presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(ii)    On June 27, 2023, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RC's vehicle did not deploy and that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured. In keeping with the fact that RC was not seriously injured in the accident, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of RC by Ortega on July 26, 2023 and August 23, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that RC presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(iii)   On August 11, 2023, an Insured named CZ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CZ's vehicle did not deploy and that CZ's vehicle was drivable following the accident. The police report further indicated that CZ was not injured. In keeping with the fact that CZ was not seriously injured in the accident, CZ did not visit any hospital emergency room following the accident. To the extent that CZ experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of CZ by Ortega on September 5, 2023 and October 18, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the follow-up examinations using CPT codes 99213 and 99214,

and thereby falsely represented that CZ presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(iv) On August 20, 2023, an Insured named HD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in HD's vehicle did not deploy and that HD's vehicle was drivable following the accident. The police report further indicated that HD was not injured. In keeping with the fact that HD was not seriously injured in the accident, HD did not visit any hospital emergency room following the accident. To the extent that HD experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of HD by Ortega on September 19, 2023 and October 19, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that HD presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(v) On November 13, 2023, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DS's vehicle did not deploy and that DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured. In keeping with the fact that DS was not seriously injured in the accident, DS did not visit any hospital emergency room following the accident. To the extent that DS experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examination of DS by Ortega on December 12, 2023, Miami Blu Sky, Lacosta, and Ortega billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that DS presented with problems of low to moderate severity during the examination.

(vi) On November 29, 2023, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JC's vehicle did not deploy. The police report further indicated that JC was not injured. In keeping with the fact that JC was not seriously injured in the accident, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of JC by Ortega on December 26, 2023, and by McCarver on January 25, 2024, Miami Blu Sky, Lacosta, and McCarver billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that JC presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(vii) On November 29, 2023, an Insured named SN was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SN's

vehicle did not deploy. The police report further indicated that SN was not injured. In keeping with the fact that SN was not seriously injured in the accident, SN did not visit any hospital emergency room following the accident. To the extent that SN experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of SN by Ortega on December 26, 2023 and by McCarver on January 25, 2024, Miami Blu Sky, Lacosta, and McCarver billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that SN presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(viii)   On December 23, 2023, an Insured named VD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in VD's vehicle did not deploy and that VD's vehicle was drivable following the accident. The police report further indicated that VD was not injured. In keeping with the fact that VD was not seriously injured in the accident, VD did not visit any hospital emergency room following the accident. To the extent that VD experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of VD by McCarver on January 29, 2024 and February 23, 2024, Miami Blu Sky, Lacosta, and McCarver billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that VD presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(ix)    On January 2, 2024, an Insured named CG was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CG's vehicle did not deploy and that CG's vehicle was drivable following the accident. The police report further indicated that CG was not injured. In keeping with the fact that CG was not seriously injured in the accident, CG did not visit any hospital emergency room following the accident. To the extent that CG experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of CG by McCarver on January 29, 2024 and February 29, 2024, Miami Blu Sky, Lacosta, and McCarver billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that CG presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

(x)     On January 2, 2024, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in SP's vehicle did not deploy and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured. In keeping with the fact that SP was not seriously injured in the accident, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems

at all as a result of the accident, they were of minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following purported follow-up examinations of SP by McCarver on January 29, 2024 and February 29, 2024, Miami Blu Sky, Lacosta, and McCarver billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that SP presented with problems of low to moderate and moderate to high severity, respectively, during the examinations.

190. In the claims for follow-up examinations identified in Exhibit "2", Miami Blu Sky, Lacosta, Ortega, and McCarver also routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

191. The charges for the follow-up examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

192. In particular, in the claims for follow-up examinations identified in Exhibit "2", neither Ortega, McCarver, nor any other health care practitioner associated with Miami Blu Sky ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all. Rather, following the purported follow-up examinations, the examining health care practitioners – working at the Defendants' direction – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

193. The bogus "follow-up examinations" that Miami Blu Sky, Lacosta, Ortega, and McCarver purported to provide to the Insureds in the claims identified in Exhibit "2" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds,

48

because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Miami Blu Sky's offices.

194.     In the claims for follow-up examinations identified in Exhibit "2", Miami Blu Sky, Lacosta, Ortega, and McCarver routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)     Miami Blu Sky was never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of Florida law.

**4.     The Fraudulent Charges for PENS Treatment at DG Esthetic and OMC Rehab**

195.     As part of their fraudulent treatment protocols, DG Esthetic, Lima, OMC Rehab, Castaneda, and McCarver, purported to provide many Insureds with a large number of medically-unnecessary PENS treatments.

196.     In the claims identified in Exhibit "1", DG Esthetic, Lima, and McCarver then billed the PENS treatments to GEICO under CPT code 64999, resulting in charges of $650.00 or $850.00, per Insured, for each date of service on which they purported to provide the PENS treatment. In the claims identified in Exhibit "3", OMC Rehab, Castaneda, and McCarver also billed the PENS treatments to GEICO under CPT code 64999, resulting in charges of $850.00 per Insured, for each date of service on which they purported to provide the PENS treatment.

197.    Like all of the other Fraudulent Services that DG Esthetic, Lima, OMC Rehab, Castaneda, and McCarver purported to provide, the charges for the PENS treatments were fraudulent in that they falsely represented that DG Esthetic, Lima, OMC Rehab, Castaneda, and McCarver were entitled to payment in the first place, when in fact they were not because they operated in violation of Florida law.

198.    The charges for the PENS treatments also were fraudulent and ineligible for PIP reimbursement in that they were medically unnecessary and illusory.

199.    In a legitimate clinical setting, PENS is a procedure that combines the features of electro-acupuncture and transcutaneous electrical nerve stimulation, whereby electrical current is applied through the skin to provide patients with pain control. PENS treatments are administered through fine needle-like electrodes that are placed in close proximity to the painful area and stimulate peripheral sensory nerves in the soft tissue.

200.    According to guidelines published by CMS, if pain is effectively controlled through PENS, then implantation of electrodes is warranted.

201.    CMS further instructs that physicians generally should be able to determine whether a patient is likely to derive a significant therapeutic benefit from continuing use of implanted electrodes within a one-month trial period.

202.    CMS further instructs that a patient can be taught how to utilize implanted electrodes and, once this is accomplished, can use them safely and effectively without physician supervision. Consequently, it is inappropriate for a patient to visit his/her physician, physical therapist, or an outpatient clinic on a continuing basis for treatment of pain with PENS treatment.

203.    Even so, DG Esthetic, Lima, OMC Rehab, Castaneda, and McCarver purported to provide large numbers of medically unnecessary PENS treatments to Insureds on an outpatient

basis, in order to maximize the amount of fraudulent and unlawful billing they could submit to GEICO and other insurers.

204.     Moreover, to the extent that DG Esthetic, Lima, OMC Rehab, Castaneda, and McCarver actually provided any electrical stimulation treatments to Insureds in the first instance, the treatments consisted of ordinary electrical stimulation, not legitimate PENS treatments.

205.     Electrical stimulation treatments are billable at much lower rate than PENS treatments.

206.     DG Esthetic, Lima, OMC Rehab, Castaneda, and McCarver deliberately misrepresented the electrical stimulation treatments they purported to provide to be PENS treatments in a calculated attempt to overcharge GEICO for the electrical stimulation treatments.

**5.       The Fraudulent Charges for Physical Therapy at the Clinic Defendants**

207.     As part of their fraudulent and unlawful schemes, the Defendants often purported to subject the Insureds in the claims identified in Exhibits "1" – "4" to weeks of medically unnecessary physical therapy treatment.

208.     In the claims identified in Exhibit "1", DG Esthetic, Lima, and McCarver typically billed the purported physical therapy services to GEICO under:

(i)      CPT code 0101T, for putative extracorporeal shock wave therapy, resulting in a charge of $850.00 for each round of extracorporeal shock wave therapy they purported to provide;

(ii)     CPT code 97110, for putative therapeutic exercises, resulting in a charge of $72.00 for each round of therapeutic exercise they purported to provide;

(iii)    CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $84.40 for each round of neuromuscular reeducation they purported to provide;

(iv)     CPT code 97140, for putative manual therapy, resulting in a charge of $66.30 for each round of manual therapy they purported to provide; and

(v)      CPT code 97035, for putative ultrasound, resulting in a charge of $35.60 for each ultrasound they purported to provide.

209.    In the claims identified in Exhibit "2", Miami Blu Sky, Sanchez, Lacosta, Ortega,

and McCarver typically billed the purported physical therapy services to GEICO under:

(i)     CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $75.00 for each round of neuromuscular reeducation they purported to provide;

(ii)    CPT code 97110, for putative therapeutic exercises, resulting in a charge of $68.00 for each round of therapeutic exercise they purported to provide;

(iii)   CPT code 97032, for putative electrical stimulation, resulting in a charge of $40.00 for each round of electrical stimulation they purported to provide;

(iv)    CPT code 97012, for putative mechanical traction therapy, resulting in a charge of $36.00 for each round of mechanical traction they purported to provide; and

(v)     CPT code 97035, for putative ultrasound, resulting in a charge of $35.00 for each ultrasound they purported to provide.

210.    In the claims identified in Exhibit "3", OMC Rehab, Castaneda, and McCarver

typically billed the purported physical therapy services to GEICO under:

(i)     CPT code 97110, for putative therapeutic exercises, resulting in a charge of $134.00 for each round of therapeutic exercise they purported to provide;

(ii)    Health Care Common Procedure Coding System ("HCCPCS") code S8948 for putative laser treatment, resulting in a charge of $400.00 for each round of laser treatment they purported to provide;

(iii)   CPT code 97530, for therapeutic activities, resulting in a charge of $89.00 for each round of therapeutic activity they purported to provide;

(iv)    CPT code 97140, for putative manual therapy, resulting in a charge of $60.00 for each round of manual therapy they purported to provide; and

(v)     CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $75.00 for each round of neuromuscular reeducation they purported to provide.

211.    In the claims identified in Exhibit "4", Preferred Rehab, Mesa, and McCarver

typically billed the purported physical therapy services to GEICO under:

(i)     CPT code 97110, for putative therapeutic exercises, resulting in a charge of $69.00 for each round of therapeutic exercise they purported to provide;

(ii)    CPT code 97530, for putative therapeutic activities, resulting in a charge of $73.00

for each round of therapeutic activity they purported to provide;

(iii)   CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $72.00 for each round of neuromuscular reeducation they purported to provide;

(iv)   CPT code 97032, for putative electrical stimulation, resulting in a charge of $41.00 for each round of electrical stimulation they purported to provide; and

(v)   CPT code 97039, for putative hydrotherapy, resulting in a charge of $30.00 for each round of hydrotherapy they purported to provide.

212.   In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they received the physical therapy.

213.   By contrast, at the Clinic Defendants, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocols.

214.   In addition, in the claims for physical therapy services identified in Exhibits "1" - "4", the Defendants falsely represented that the physical therapy services were lawfully performed and billed to GEICO, when in fact they were not because they were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals.

215.   In the claims for physical therapy services identified in Exhibits "1" - "4", the Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)   the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii)   the services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals;

(iii)     the billing for the services misrepresented the identities of the actual treating practitioners; and

(iv)      the Defendants never were eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they unlawfully operated in violation of Florida law.

### III.     The Fraudulent Claims the Defendants Submitted to GEICO

216.    To support their fraudulent charges, the respective Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO through DG Esthetic, Miami Blu Sky, OMC Rehab, and Preferred Rehab – containing thousands of individual charges – seeking payment for the Fraudulent Services that the Defendants were not entitled to receive.

217.    The claims that the Defendants submitted to GEICO were false and misleading in the following, material respects:

(i)      The HCFA-1500 forms and treatment reports by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)     The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii)    The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

### IV.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

218.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of

54

charges to GEICO.

219. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

220. For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

221. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently were never performed in the first instance.

222. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

223. The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

224. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,750,000.00.

225. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against DG Esthetic**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

226.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

227.     There is an actual case and controversy between GEICO and DG Esthetic regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

228.     DG Esthetic has no right to receive payment for any pending bills submitted to GEICO because DG Esthetic was unlawfully operated in violation of Florida law.

229.     DG Esthetic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

230.     DG Esthetic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

231.     DG Esthetic has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

232.     DG Esthetic has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

233.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that DG Esthetic has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Lima
### (Violation of RICO, 18 U.S.C. § 1962(c))

234.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

235.    DG Esthetic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

236.    Lima has knowingly conducted and/or participated in, directly or indirectly, the conduct of DG Esthetic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that DG Esthetic was not eligible to receive under the No-Fault Law because: (i) DG Esthetic was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

237.    A representative sample of the fraudulent bills and corresponding mailings

57

submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

238. DG Esthetic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lima operated DG Esthetic, inasmuch as DG Esthetic was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for DG Esthetic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that DG Esthetic continues to attempt collection on the fraudulent billing submitted through DG Esthetic to the present day.

239. DG Esthetic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by DG Esthetic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

240. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $307,000.00 pursuant to the fraudulent bills submitted through the DG Esthetic enterprise.

241. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**THIRD CAUSE OF ACTION**
**Against Lima and McCarver**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

242. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

58

243. DG Esthetic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

244. Lima and McCarver were employed by – or associated with – the DG Esthetic enterprise.

245. Lima and McCarver knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of DG Esthetic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that DG Esthetic was not eligible to receive under the No-Fault Law because: (i) DG Esthetic was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

246. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

247. Lima and McCarver knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by

submitting or facilitating the submission of the fraudulent charges to GEICO.

248.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $307,000.00 pursuant to the fraudulent bills submitted through the DG Esthetic enterprise.

249.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## FOURTH CAUSE OF ACTION
### Against DG Esthetic, Lima, and McCarver
### (Under Fla. Stat. §§ 501.201 et seq.)

250.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

251.   DG Esthetic, Lima, and McCarver are actively engaged in trade and commerce in the State of Florida.

252.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

253.   DG Esthetic, Lima, and McCarver engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

254.   The bills and supporting documents submitted – or caused to be submitted – to GEICO by DG Esthetic, Lima, and McCarver were fraudulent in that they misrepresented: (i) DG Esthetic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

255.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of DG Esthetic, Lima, and McCarver has been

60

materially injurious to GEICO and its Insureds.

256. The conduct of DG Esthetic, Lima, and McCarver was the actual and proximate cause of the damages sustained by GEICO.

257. DG Esthetic, Lima, and McCarver's unfair and deceptive acts have caused GEICO to sustain damages of at least $307,000.00.

258. By reason DG Esthetic, Lima, and McCarver's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against DG Esthetic, Lima, and McCarver**
**(Common Law Fraud)**

259. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

260. DG Esthetic, Lima, and McCarver intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through DG Esthetic for the Fraudulent Services.

261. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that DG Esthetic was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

262.     DG Esthetic, Lima, and McCarver intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DG Esthetic that were not reimbursable.

263.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $307,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by DG Esthetic, Lima, and McCarver through DG Esthetic.

264.     DG Esthetic, Lima, and McCarver's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

265.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### SIXTH CAUSE OF ACTION
### Against DG Esthetic, Lima, and McCarver
### (Unjust Enrichment)

266.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

267.     As set forth above, DG Esthetic, Lima, and McCarver have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

268.     When GEICO paid the bills and charges submitted – or caused to be submitted – by DG Esthetic, Lima, and McCarver through DG Esthetic, it reasonably believed that it was legally obligated to make such payments based on DG Esthetic, Lima, and McCarver's improper, unlawful, and/or unjust acts.

269. DG Esthetic, Lima, and McCarver have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that DG Esthetic, Lima, and McCarver voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

270. DG Esthetic, Lima, and McCarver's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

271. By reason of the above, DG Esthetic, Lima, and McCarver have been unjustly enriched in an amount to be determined at trial, but in no event less than $307,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Miami Blu Sky**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

272. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

273. There is an actual case and controversy between GEICO and Miami Blu Sky regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

274. Miami Blu Sky has no right to receive payment for any pending bills submitted to GEICO because Miami Blu Sky was unlawfully operated in violation of Florida law.

275. Miami Blu Sky has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

276. Miami Blu Sky has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

277.    Miami Blu Sky has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

278.    Miami Blu Sky has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

279.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Miami Blu Sky has no right to receive payment for any pending bills submitted to GEICO.

**EIGHTH CAUSE OF ACTION**
**Against Sanchez and Lacosta**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

280.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

281.    Miami Blu Sky is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

282.    Sanchez and Lacosta has knowingly conducted and/or participated in, directly or indirectly, the conduct of Miami Blu Sky's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over three years seeking payments that Miami Blu Sky was not eligible to receive under the No-Fault Law because: (i) Miami Blu Sky was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

64

protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

283. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

284. Miami Blu Sky's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sanchez and Lacosta operated Miami Blu Sky, inasmuch as Miami Blu Sky was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Miami Blu Sky to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Miami Blu Sky continues to attempt collection on the fraudulent billing submitted through Miami Blu Sky to the present day.

285. Miami Blu Sky is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Miami Blu Sky in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

286. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $791,000.00 pursuant to the fraudulent bills submitted through the Miami Blu Sky enterprise.

287. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

65

attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### NINTH CAUSE OF ACTION
**Against Sanchez, Lacosta, Ortega, and McCarver**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

288.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

289.   Miami Blu Sky is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

290.   Sanchez, Lacosta, Ortega, and McCarver were employed by – or associated with – the Miami Blu Sky enterprise.

291.   Sanchez, Lacosta, Ortega, and McCarver knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Miami Blu Sky's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over three years seeking payments that Miami Blu Sky was not eligible to receive under the No-Fault Law because: (i) Miami Blu Sky was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to

GEICO.

292.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

293.    Sanchez, Lacosta, Ortega, and McCarver knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

294.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $791,000.00 pursuant to the fraudulent bills submitted through the Miami Blu Sky enterprise.

295.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**TENTH CAUSE OF ACTION**
**Against Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver**
**(Under Fla. Stat. §§ 501.201 et seq.)**

296.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

297.    Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver are actively engaged in trade and commerce in the State of Florida.

298.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

299.    Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and

67

execution of their scheme to illegally obtain PIP Benefits from GEICO.

300.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver were fraudulent in that they misrepresented: (i) Miami Blu Sky's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

301.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver has been materially injurious to GEICO and its Insureds.

302.    The conduct of Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver was the actual and proximate cause of the damages sustained by GEICO.

303.    Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver's unfair and deceptive acts have caused GEICO to sustain damages of at least $791,000.00.

304.    By reason of Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**ELEVENTH CAUSE OF ACTION**
**Against Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver**
**(Common Law Fraud)**

305.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

306.    Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of

fraudulent charges through Miami Blu Sky for the Fraudulent Services.

307. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Miami Blu Sky was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

308. Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Miami Blu Sky that were not reimbursable.

309. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $791,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver through Miami Blu Sky.

310. Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

311. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## TWELFTH CAUSE OF ACTION
### Against Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver
### (Unjust Enrichment)

312. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

313. As set forth above, Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

314. When GEICO paid the bills and charges submitted – or caused to be submitted – by Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver through Miami Blu Sky, it reasonably believed that it was legally obligated to make such payments based on Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver's improper, unlawful, and/or unjust acts.

315. Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

316. Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

317. By reason of the above, Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver have been unjustly enriched in an amount to be determined at trial, but in no event less than $791,000.00.

## THIRTEENTH CAUSE OF ACTION
### Against OMC Rehab
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

318. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

319. There is an actual case and controversy between GEICO and OMC Rehab regarding

more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

320. OMC Rehab has no right to receive payment for any pending bills submitted to GEICO because OMC Rehab was unlawfully operated in violation of Florida law.

321. OMC Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

322. OMC Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

323. OMC Rehab has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

324. OMC Rehab has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

325. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that OMC Rehab has no right to receive payment for any pending bills submitted to GEICO.

**FOURTEENTH CAUSE OF ACTION**
**Against Castaneda**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

326.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

327.    OMC Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

328.    Castaneda has knowingly conducted and/or participated in, directly or indirectly, the conduct of OMC Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over two years seeking payments that OMC Rehab was not eligible to receive under the No-Fault Law because: (i) OMC Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

329.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

330.    OMC Rehab's business is racketeering activity, inasmuch as the enterprise exists

72

for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Castaneda operated OMC Rehab, inasmuch as OMC Rehab was not engaged in a legitimate health care practice and acts of mail fraud were, therefore, essential in order for OMC Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that OMC Rehab continues to attempt collection on the fraudulent billing submitted through OMC Rehab to the present day.

331.    OMC Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by OMC Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

332.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $107,000.00 pursuant to the fraudulent bills submitted through OMC Rehab.

333.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### FIFTEENTH CAUSE OF ACTION
#### Against Castaneda and McCarver
#### (Violation of RICO, 18 U.S.C. § 1962(d))

334.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

335.    OMC Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

336.    Castaneda and McCarver were employed by – or associated with – the OMC Rehab

enterprise.

337. Castaneda and McCarver knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of OMC Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over two years seeking payments that OMC Rehab was not eligible to receive under the No-Fault Law because: (i) OMC Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

338. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

339. Castaneda and McCarver knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

340. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $107,000.00 pursuant to the fraudulent bills submitted

through the OMC Rehab enterprise.

341.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTEENTH CAUSE OF ACTION
### Against OMC Rehab, Castaneda, and McCarver
### (Under Fla. Stat. §§ 501.201 et seq.)

342.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

343.    OMC Rehab, Castaneda, and McCarver are actively engaged in trade and commerce in the State of Florida.

344.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

345.    OMC Rehab, Castaneda, and McCarver engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

346.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by OMC Rehab, Castaneda, and McCarver were fraudulent in that they misrepresented: (i) OMC Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

347.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of OMC Rehab, Castaneda, and McCarver has been materially injurious to GEICO and its Insureds.

348.    The conduct of OMC Rehab, Castaneda, and McCarver was the actual and

75

proximate cause of the damages sustained by GEICO.

349.    OMC Rehab, Castaneda, and McCarver's unfair and deceptive acts have caused GEICO to sustain damages of at least $107,000.00.

350.    By reason of OMC Rehab, Castaneda, and McCarver's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**SEVENTEENTH CAUSE OF ACTION**
**Against OMC Rehab, Castaneda, and McCarver**
**(Common Law Fraud)**

351.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

352.    OMC Rehab, Castaneda, and McCarver intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through OMC Rehab for the Fraudulent Services.

353.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that OMC Rehab, Castaneda, and McCarver was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

354.    OMC Rehab, Castaneda, and McCarver intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO

to pay charges submitted through OMC Rehab that were not reimbursable.

355. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $107,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by OMC Rehab, Castaneda, and McCarver through OMC Rehab.

356. OMC Rehab, Castaneda, and McCarver's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

357. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## EIGHTEENTH CAUSE OF ACTION
### Against OMC Rehab, Castaneda, and McCarver
### (Unjust Enrichment)

358. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

359. As set forth above, OMC Rehab, Castaneda, and McCarver have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

360. When GEICO paid the bills and charges submitted – or caused to be submitted – by OMC Rehab, Castaneda, and McCarver through OMC Rehab, it reasonably believed that it was legally obligated to make such payments based on OMC Rehab, Castaneda, and McCarver's improper, unlawful, and/or unjust acts.

361. OMC Rehab, Castaneda, and McCarver have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that OMC Rehab, Castaneda, and McCarver

voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

362. OMC Rehab, Castaneda, and McCarver's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

363. By reason of the above, OMC Rehab, Castaneda, and McCarver have been unjustly enriched in an amount to be determined at trial, but in no event less than $107,000.00.

## NINETEENTH CAUSE OF ACTION
### Against Preferred Rehab
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

364. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

365. There is an actual case and controversy between GEICO and Preferred Rehab regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

366. Preferred Rehab has no right to receive payment for any pending bills submitted to GEICO because Preferred Rehab was unlawfully operated in violation of Florida law.

367. Preferred Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

368. Preferred Rehab has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

369. Preferred Rehab has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

370.     Preferred Rehab has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

371.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Preferred Rehab has no right to receive payment for any pending bills submitted to GEICO.

## TWENTIETH CAUSE OF ACTION
### Against Mesa
### (Violation of RICO, 18 U.S.C. § 1962(c))

372.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

373.     Preferred Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

374.     Mesa has knowingly conducted and/or participated in, directly or indirectly, the conduct of Preferred Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over one year seeking payments that Preferred Rehab was not eligible to receive under the No-Fault Law because: (i) Preferred Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were

79

never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

375. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

376. Preferred Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mesa operated Preferred Rehab, inasmuch as Preferred Rehab was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Preferred Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Preferred Rehab continues to attempt collection on the fraudulent billing submitted through Preferred Rehab to the present day.

377. Preferred Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Preferred Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

378. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $551,000.00 pursuant to the fraudulent bills submitted through the Preferred Rehab enterprise.

379. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Mesa and McCarver**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

380.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

381.    Preferred Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

382.    Mesa and McCarver were employed by – or associated with – the Preferred Rehab enterprise.

383.    Mesa and McCarver knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Preferred Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over one year seeking payments that Preferred Rehab was not eligible to receive under the No-Fault Law because: (i) Preferred Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

384.    A representative sample of the fraudulent bills and corresponding mailings

81

submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

385.    Mesa and McCarver knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

386.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $551,000.00 pursuant to the fraudulent bills submitted through the Preferred Rehab enterprise.

387.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-SECOND CAUSE OF ACTION
### Against Preferred Rehab, Mesa, and McCarver
### (Under Fla. Stat. §§ 501.201 et seq.)

388.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

389.    Preferred Rehab, Mesa, and McCarver are actively engaged in trade and commerce in the State of Florida.

390.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

391.    Preferred Rehab, Mesa, and McCarver engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

392.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by Preferred Rehab, Mesa, and McCarver were fraudulent in that they misrepresented: (i)

82

Preferred Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

393.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Preferred Rehab, Mesa, and McCarver has been materially injurious to GEICO and its Insureds.

394.   The conduct of Preferred Rehab, Mesa, and McCarver was the actual and proximate cause of the damages sustained by GEICO.

395.   Preferred Rehab, Mesa, and McCarver's unfair and deceptive acts have caused GEICO to sustain damages of at least $551,000.00.

396.   By reason of Preferred Rehab, Mesa, and McCarver's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### TWENTY-THIRD CAUSE OF ACTION
#### Against Preferred Rehab, Mesa, and McCarver
#### (Common Law Fraud)

397.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

398.   Preferred Rehab, Mesa, and McCarver intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Preferred Rehab for the Fraudulent Services.

399.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Preferred Rehab was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not;

83

(ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

400.    Preferred Rehab, Mesa, and McCarver intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Preferred Rehab that were not reimbursable.

401.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $551,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Preferred Rehab, Mesa, and McCarver through Preferred Rehab.

402.    Preferred Rehab, Mesa, and McCarver's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

403.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Preferred Rehab, Mesa, and McCarver
### (Unjust Enrichment)

404.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-225, above.

84

405. As set forth above, Preferred Rehab, Mesa, and McCarver have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

406. When GEICO paid the bills and charges submitted – or caused to be submitted – by Preferred Rehab, Mesa, and McCarver through Preferred Rehab, it reasonably believed that it was legally obligated to make such payments based on Preferred Rehab, Mesa, and McCarver's improper, unlawful, and/or unjust acts.

407. Preferred Rehab, Mesa, and McCarver have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Preferred Rehab, Mesa, and McCarver voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

408. Preferred Rehab, Mesa, and McCarver's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

409. By reason of the above, Preferred Rehab, Mesa, and McCarver have been unjustly enriched in an amount to be determined at trial, but in no event less than $551,000.00.

## JURY DEMAND

410. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgement be entered in their favor:

A. On the First Cause of Action against DG Esthetic, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that DG Esthetic has no right to receive payment for any of the pending bills submitted to GEICO.

B. On the Second Cause of Action against Lima, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $307,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

85

C.      On the Third Cause of Action against Lima and McCarver, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $307,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

D.      On the Fourth Cause of Action against DG Esthetic, Lima, and McCarver, compensatory damages in an amount to be determined at trial but in excess of $307,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.      On the Fifth Cause of Action against DG Esthetic, Lima, and McCarver, compensatory damages in an amount to be determined at trial but in excess of $307,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.      On the Sixth Cause of Action against DG Esthetic, Lima, and McCarver, more than $307,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G.      On the Seventh Cause of Action against Miami Blu Sky, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Miami Blu Sky has no right to receive payment for any of the pending bills submitted to GEICO.

H.      On the Eighth Cause of Action against Sanchez and Lacosta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $791,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

I.      On the Ninth Cause of Action against Sanchez, Lacosta, Ortega, and McCarver, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $791,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18

U.S.C. § 1964(c), plus interest.

J.      On the Tenth Cause of Action against Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver, compensatory damages in an amount to be determined at trial but in excess of $791,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

K.      On the Eleventh Cause of Action against Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver, compensatory damages in an amount to be determined at trial but in excess of $791,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L.      On the Twelfth Cause of Action against Miami Blu Sky, Sanchez, Lacosta, Ortega, and McCarver, more than $791,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

M.      On the Thirteenth Cause of Action against OMC Rehab, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that OMC Rehab has no right to receive payment for any of the pending bills submitted to GEICO.

N.      On the Fourteenth Cause of Action against Castaneda, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $107,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

O.      On the Fifteenth Cause of Action against Castaneda and McCarver, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $107,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

P.      On the Sixteenth Cause of Action against OMC Rehab, Castaneda, and McCarver, compensatory damages in an amount to be determined at trial but in excess of $107,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

Q.      On the Seventeenth Cause of Action against OMC Rehab, Castaneda, and McCarver, compensatory damages in an amount to be determined at trial but in excess of $107,000.00, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

R.      On the Eighteenth Cause of Action against OMC Rehab, Castaneda, and McCarver, more than $107,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

S.      On the Nineteenth Cause of Action against Preferred Rehab, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Preferred Rehab has no right to receive payment for any of the pending bills submitted to GEICO.

T.      On the Twentieth Cause of Action against Mesa, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $551,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

U.      On the Twenty-First Cause of Action against Mesa and McCarver, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $551,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

V.      On the Twenty-Second Cause of Action against Preferred Rehab, Mesa, and McCarver, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $551,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

W.      On the Twenty-Third Cause of Action against Preferred Rehab, Mesa, and McCarver, compensatory damages in an amount to be determined at trial but in excess of $551,000.00, together with punitive damages, costs, and interest, along with such other and further

88

relief as this Court deems just, proper, and equitable.

X.     On the Twenty-Fourth Cause of Action against Preferred Rehab, Mesa, and

McCarver, more than $551,000.00 in compensatory damages, plus costs and interest, along with

such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
            April 21, 2026

Respectfully submitted,

*/s/ Max Gershenoff*

Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
**RIVKIN RADLER LLP**
Riverplace Tower
1301 Riverplace Blvd., Suite 1000
Jacksonville, Florida 32207
Phone: (904) 791-8948
Facsimile: (904) 598-6225
-and-
926 RXR Plaza
Uniondale, New York 11556
Phone: (516) 357-3226
Facsimile: (516) 357-3333
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com

*Counsel for Plaintiffs*
